UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEM GLOBAL YIELD FUND LTD.,

                          Plaintiff,

          -v-

SURGILIGHT, INC., COLETTE COZEAN, and
STUART MICHELSON,

                          Defendants.

Case No. 04-CV-4451 (KMK)

<u>OPINION and ORDER</u>

<u>Appearances:</u>

August Charles Venturini, Esq.
Venturini & Associates
New York, NY
*Counsel for Plaintiff*

Philip Arwood Byler, Esq.
Nesenoff & Miltenberg, LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        This case is before the Court on Plaintiff's Motion for Partial Summary Judgment and

Defendants' Motion to Amend to Assert Counterclaims.

        GEM Global Yield Fund Ltd. ("GEM"), Plaintiff, seeks partial summary judgment on its

claim for payment under the Convertible Promissory Note appended to an Agreement signed

between the Parties on April 11, 2003.  In the event that Plaintiff's Motion is granted, Plaintiff

also seeks a preliminary injunction preventing Defendants from dissipating assets that would

frustrate enforcement of the judgment.

        SurgiLight, Inc., Colette Cozean, and Stuart Michelson, Defendants, seek to amend their

Answer to assert four counterclaims.

For the reasons stated below, Plaintiff's Motion for Partial Summary Judgment is denied in part and granted in part. Defendants' Motion to Amend is also denied in part and granted in part.

## I. Background

### A. Factual History

#### 1. The Parties

Plaintiff GEM is a West Indies corporation. (Compl. ¶ 6) Defendant SurgiLight is a Florida corporation with its principal place of business in Florida. (Compl. ¶ 3) SurgiLight acquires and develops laser technologies for applications in ophthalmology and dermatology. (Compl. ¶ 3) SurgiLight's securities are registered with the Securities and Exchange Commission ("SEC") under section 12(g), which was added to the 1934 Securities Exchange Act ("the Act") in 1964. (Compl. ¶ 3) SurgiLight's founder and former Chief Executive Officer, Dr. Jui-Teng Lin, was found guilty on charges of securities fraud and money laundering by a jury in the United States District Court of the Eastern District of New York. (Compl. ¶ 31; Defs.' Rule 56.1 Statement ¶ 21) Defendant Colette Cozean, a resident of California, is a Director, Chairwoman of the Board, and an officer of SurgiLight. (Compl. ¶ 4) Defendant Stuart Michelson, a resident of Florida, is a Director and Officer of SurgiLight. (Compl. ¶ 5)

#### 2. The Convertible Debenture Purchase Agreement and Amendment Agreement

On June 30, 2000, GEM and SurgiLight entered into a Convertible Debenture Purchase Agreement ("Debenture Agreement"). Pursuant to the Debenture Agreement, SurgiLight issued and sold to GEM its three percent Convertible Debentures in the principal amount of $3,000 due

2

November 8, 2003. (Compl. ¶ 7) When Plaintiff wished to convert part of the outstanding balance, it was to make a written request to its counsel, who would then release the requested number of shares from escrow. (Defs.' Mem. of Law in Opp. to Pl.'s Mot. for Partial Summ. J. ("Defs.' Opp.") 7)

On November 22, 2002, GEM and SurgiLight executed an Amendment Agreement in the amount of $1,960,000, which was the outstanding balance due on the Debenture Agreement. (Compl. ¶ 8) Under the Amendment Agreement, SurgiLight agreed to pay GEM a cash payment of $1,000,000 within thirty days and warranted payment of the right to purchase 100,000 shares of its common stock at $0.12 per share. (Compl. ¶ 9)

On December 30, 2002, GEM declared SurgiLight in default of the Debenture Agreement and Amendment Agreement for its failure to make the cash payment, deliver common shares, and register the shares with the SEC. (Compl. ¶ 10) SurgiLight explains that its financing for the $1,000,000 payment was delayed, so that SurgiLight was unable to make the payment, leading GEM to declare SurgiLight in default. (Defs.' Rule 56.1 Statement ¶ 6)

### 3. The April 11, 2003 Agreement

In January 2003, GEM informed SurgiLight of its intent to convert the convertible debentures it held into shares of SurgiLight common stock. (Compl. ¶ 11) Thereafter, on April 11, 2003, GEM and SurgiLight entered into an Agreement ("April 11, 2003 Agreement") in which the Parties agreed that the outstanding balance under the Debenture Agreement was $2,000,000. (Grocock Decl. Ex. E 1 ¶ 1) Pursuant to the April 11, 2003 Agreement, GEM executed and delivered a Convertible Promissory Note ("Note") in the amount of $2,000,000 in exchange for the original Debenture. (Compl. ¶ 13; Grocock Decl. Ex. E 1 ¶ 1) The April 11,

2003 Agreement states that the "Note replaces and supercedes the Debenture and Debenture Purchase Agreement in all respects, and all obligations and rights of the parties under the Debenture and Debenture Purchase Agreement are hereby terminated and of no further force or effect." (Grocock Decl. Ex. E 1 ¶ 1)

The Note is convertible into 21,500,000 shares of SurgiLight's common stock at the conversion price of $0.093 per share. (Compl. ¶ 15) On June 17, 2003, pursuant to the April 11, 2003 Agreement, SurgiLight issued to GEM 5,800,216 shares of its common stock. When combined with the previously escrowed 4,002,132 shares that collateralized the original Debenture, GEM owned a total of 9,802,348 shares ("Initial Shares"). (Compl. ¶ 18; Defs.' Rule 56.1 Statement ¶ 18)

Additionally, the Parties agreed in the April 11, 2003 Agreement that upon the effectiveness of an amendment to SurgiLight's Certificate of Incorporation to increase the number of authorized shares of common stock, the outstanding balance under the Note of 11,697,652 shares would be automatically converted ("Remaining Shares"). (Grocock Decl. Ex. E 2 ¶ 3(b)) SurgiLight agreed to use its best efforts to obtain shareholder approval of the proposed Certificate of Amendment. (Grocock Decl. Ex. E 2 ¶ 3(b)) A failure to secure the Certificate of Amendment by July 31, 2003 constituted a default under the Note and triggered SurgiLight's obligation to pay eight percent interest in cash on the balance of the Note from the date of default until the date of full conversion. (Compl. ¶ 21; Defs.' Rule 56.1 Statement ¶ 14)

The Parties further agreed that SurgiLight would use its best efforts to register the Initial and Remaining Shares for resale under the Act and to comply with all state securities laws. The registration for the Initial Shares was to be effective withing six months of signing the agreement,

and for the Remaining Shares the registration was to be effective within six months of July 31, 2003. (Grocock Decl. Ex. 3 ¶ 8(a)(i)) Failure to register the Initial or Remaining Shares within the specified time frame would require SurgiLight to issue additional shares to GEM. (Grocock Decl. 3 ¶ 8(b)) To date, SurgiLight has not issued the Remaining Shares and has not registered either the Initial or Remaining Shares. (Compl. ¶ 24)

Finally, the Parties agreed that, in the event a suit was brought to enforce the April 11, 2003 Agreement, the prevailing party was entitled to attorneys' fees. (Pl.'s Rule 56.1 Statement ¶ 15; Defs.' Rule 56.1 Statement ¶ 15)

#### 4. Assignment of Intellectual Property

From 1991 to 1999, Defendant Cozean founded and managed a company by the name of Premier Laser Systems. (Compl. ¶ 33) In October 2000, SurgiLight acquired the inventory, intellectual property, and technology of the ophthalmic laser division of Premier. (Compl. ¶ 35) Plaintiff alleges that the infrared erbium laser acquired from Premier is the product supporting the core business of SurgiLight. (Compl. ¶ 36) In November 2000, SurgiLight entered into an agreement with Cozean whereby she would serve as SurgiLight's CEO in return for certain compensation. (Compl. ¶ 37)

In October 2002, SurgiLight granted Cozean and Defendant Michelson liens on the intellectual property acquired from Premier in connection with two $20,000 loans made to SurgiLight by Cozean and Michelson and a $6,000 loan made to SurgiLight by Michelson. (Compl. ¶ 38) Plaintiff alleges that the existence of the liens was not publicly disclosed until more than one year after the execution of the transactions and after GEM entered into the April 11, 2003 Agreement with SurgiLight. (Compl. ¶ 41)

### 5.  Board of Directors

SurgiLight's Board of Directors ("Board") is comprised of nine directors elected to staggered terms of three years, with three directors' seats subject to election each year. (Compl. ¶ 43)  The April 11, 2003 Agreement entitled GEM to nominate one director for election to the Board.  (Compl. ¶ 44)  Currently GEM's nominee, Edward Tobin is one of the nine members of the Board.  (Compl. ¶ 44)

Plaintiff alleges that pursuant to Florida law and SurgiLight's bylaws, SurgiLight must hold a meeting of shareholders annually for the election of directors.  (Compl. ¶¶ 45-46) SurgiLight failed to hold a meeting in 2003 or 2004.  (Compl. ¶¶ 45-46; Defs.' Rule 56.1 Statement ¶ 21)

### B.  Procedural History

### 1.  The Complaint

GEM filed its Complaint against Defendants on June 14, 2004.  The Complaint alleges that (1) SurgiLight breached the April 11, 2003 Agreement by failing to issue the Remaining Shares, failing to register the Initial and Remaining Shares, and failing to remit payments due under the Agreement (Compl. ¶ 50); (2) SurgiLight breached its obligations under the Convertible Promissory Note by failing to issue shares as agreed in the Note (Compl. ¶ 57); (3) SurgiLight, Cozean, and Michelson violated section 10(b) and Rule 10b-5 of the Act in connection with the purchase and sale of SurgiLight stock pursuant to the Debenture Agreement and the April 11, 2003 Agreement by concealing the liens acquired by Cozean and Michelson (Compl. ¶ 62); (4) SurgiLight, Cozean, and Michelson violated section 10(b) and Rule 10b-5 of the Act by knowingly engaging in a "pump and dump" scheme which artificially elevated

SurgiLight's stock price and volume during the period of negotiation of the Debenture

Agreement (Compl. ¶¶ 71-74); (5) as a controlling person of SurgiLight, Michelson violated

section 20 of the Act by engaging in self-interested transactions (Compl. ¶ 80); (6) as a

controlling person of SurgiLight, Cozean violated section 20 of the Act by engaging in self-

interested transactions (Compl. ¶ 84); (7) SurgiLight, Cozean, and Michelson committed

common law fraud by failing to disclose the liens acquired by Cozean and Michelson, and

SurgiLight committed common law fraud by engaging in a "pump and dump" scheme.  (Compl.

¶¶ 87-89); and (8) GEM is entitled to attorneys' fees pursuant to paragraph 16(i) of the April 11,

2003 Agreement.  (Compl. ¶ 99)  Plaintiff seeks monetary relief for these alleged wrongs.

Defendants oppose Plaintiff's Motion on the grounds that the Note is not a negotiable instrument

and that granting partial summary judgment would result in piecemeal litigation.

### 2.  The Preliminary Injunction

On June 14, 2004, Plaintiff also sought by an Order to Show Cause a preliminary and

permanent injunction ordering SurgiLight to:  (1) issue to GEM 11,697,652 in common stock; (2)

register the Initial and Remaining Shares; (3) issue to GEM an additional 107,500 shares under

the April 11, 2003 Agreement; (4) hold an annual shareholder meeting; (5) permit GEM to vote

all of its shares of SurgiLight stock whether issued or not; and (6) produce the names and

addresses of all its shareholders.  (Compl. ¶ 97)

On June 17, 2004, Defendants were served with the Complaint and Order to Show Cause.

On June 21, 2004, Defendants retained counsel.  The Parties appeared before Judge Gerald E.

Lynch on June 25, 2004 and discussed the merits of Plaintiff's application for a preliminary

injunction, and subsequently exchanged briefs.  On August 2, 2004, Plaintiff withdrew its

application for a preliminary injunction, and on August 10, 2004, Judge Lynch issued an order denying Plaintiff's application as moot. The case was reassigned to this Court on September 3, 2004

### 3. The Proposed Amended Answer

Defendants' counsel avers that at a January 27, 2005 case management conference, GEM's counsel stated his intention to seek to amend the Complaint. (Decl. of Philip A. Byler in Support of Mot. to Am. Answer with Counterclaims ("Byler Decl.") ¶ 13; Reply Decl. of Philip A. Byler in Support of Mot. to Am. Answer with Counterclaims ("Byler Reply Decl.") ¶ 8) In response, Defendants' counsel alleges that he proposed a stipulation whereby the Parties would consent to amended pleading by both sides. (Byler Decl. ¶ 13; Byler Reply Decl. ¶ 8) In fact, according to Defendants' counsel, the Parties drafted a stipulation in late February and early March 2005. (Byler Decl. ¶ 13; Byler Reply Decl. ¶ 8) However, the stipulation was never signed or presented to the Court. Instead, Plaintiff requested permission to file a Motion for Partial Summary Judgment on April 12, 2005.

Defendants' counsel also states that at the May 2, 2005 pre-motion conference, he reiterated his interest in amending the Answer and was directed by the Court to submit a letter requesting leave to amend. (Byler Decl. ¶ 14) On May 4, 2005, Defendants' counsel submitted a letter to the Court requesting leave to make a motion to amend to assert counterclaims, which the Court granted on May 12, 2005. (Byler Decl. ¶ 15)

Defendants filed their Motion to Amend, seeking to add four counterclaims alleging that: (1) as a ten percent beneficial owner, GEM violated section 16(b) of the Act by purchasing and selling or short-selling and purchasing SurgiLight stocks within six months from February 14,

2000 to February 11, 2005 (Byler Reply Decl. Ex. A ("Second Am. Answer") ¶¶ 136, 138); (2)

GEM violated section 10(b) of the Act by engaging in market manipulation through short-selling

SurgiLight stock from February 11, 2000 to April 11, 2003 (Second Am. Answer ¶ 145); (3)

GEM breached the Debenture Agreement by exceeding its volume restrictions (Second Am.

Answer ¶ 149); and (4) Edward Tobin breached his fiduciary duty owed to SurgiLight by

disclosing confidential information to outside companies, making false accusations against

Cozean and the SurgiLight Board, purporting to act on behalf of SurgiLight without authority,

and engaging in obstructive behavior as a result of his conflict of interest stemming from his

relationship with GEM.[1]  (Second Am. Answer ¶ 153-54)  Defendants request monetary and

injunctive relief for these alleged wrongs.  Plaintiff opposes Defendants' Motion on the grounds

that the proposed amendments constitute unfair prejudice, undue delay, bad faith, and that they

would be futile.

## II.  Discussion

### A.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff argues that it is entitled to summary judgment on the Note because it is a

negotiable instrument and Defendants have not made payments according to the Note's terms.

Plaintiff seeks payment in the amount of $1,087,881.64 – the remaining balance on the principal

– plus eight percent interest on the principal from July 31, 2003.

---

[1]Defendants submitted their Amended Answer and Counterclaims along with their Motion to Amend to Assert Counterclaims on May 23, 2005.  When Plaintiff identified the defects in that Answer, Defendants submitted a Second Amended Answer and Counterclaims along with their Reply on November 22, 2005.  At the request of Plaintiff's counsel at oral argument on June 30, 2006, the Court allowed counsel to submit a letter discussing the Second Amended Answer and Counterclaims.

Defendants proffer two main arguments against granting summary judgment. First, Defendants contend that the Note is not a negotiable instrument because it calls for payment in stock, not money. Defendant seeks to introduce parol evidence to demonstrate that the Parties never intended that the principal balance of the Note be payable in cash. Second, Defendants argue that partial summary judgment is inappropriate because it will result in piecemeal litigation. Defendants contend that their counterclaims could offset Plaintiff's recovery under the Note and that consideration of the entire history between the Parties will shed light on Defendants' default under the Note.

### 1. Standard

Upon the motion of a party, pursuant to Federal Rule of Civil Procedure 56(b) and (c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on files, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the movant to show that there is no genuine factual dispute. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). All reasonable inferences must be made in the non-movant's favor. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted." *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) (citing *Green Door Realty Corp. v. TIG Ins. Co.,* 329

F.3d 282, 286-87 (2d Cir. 2003)); *see also Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The genuine issue of material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

In contract actions, the Second Circuit has articulated more specific standards for summary judgment:

> In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish. Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate. The mere assertion of an ambiguity does not suffice to make an issue of fact. Ambiguity resides in a writing when - after it is viewed objectively - more than one meaning may reasonably be ascribed to the language used. Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly.

*Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (citing *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990) (citations, alterations, and quotation marks omitted)).

## 2. Applicable Law

Both the April 11, 2003 Agreement and the Note state that New York law governs their construction and interpretation. (*See* Notice of Mot. Ex. C, D) Under New York Law, in order for a "note" to be a negotiable instrument it must: "(a) be signed by the maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, [or] obligation, . . . ; and (c) be payable on demand or at a definite time; and (d) be payable

to order or to bearer." N.Y. U.C.C. § 3-104. "[I]ndicia of negotiability must be visible on the face of the instrument." *A.I. Trade Fin., Inc. v. Laminaciones de Lesaca, S.A.*, 41 F.3d 830, 836 (2d Cir. 1994). "[S]ummary judgment is proper when plaintiff establishes proof of a note and a defendant's failure to make payment according to its terms." *Bankers Trust Co. v. F.D. Rich & Co.*, No. 90 Civ. 4827, 1991 WL 221091, at *2 (S.D.N.Y. Oct. 16, 1991).

If a purported note is not negotiable, however, then it should be construed as a contract according to the New York General Obligations Law. *See McCarthy v. Sessions*, 572 N.Y.S.2d 749, 750 (App. Div. 1991) (holding that a negotiable instrument is governed by U.C.C. article 3, while a promise in writing is construed according to the General Obligations Law).

### 3. Negotiability

There is no dispute that the Note meets three of the four requirements for a negotiable instrument under New York Law. First, the Note is signed by Cozean on behalf of SurgiLight, who is the maker. Second, the Note does not state a time for payment, and is therefore payable upon demand. *See* N.Y. U.C.C. § 3-108; *Lakhaney v. Anzelone*, 788 F. Supp. 160, 163-64 (S.D.N.Y. 1992) (holding that a note which does not indicate a time for payment "is presumed to be payable on demand unless there is some indication that a date of payment was intended and mistakenly omitted"); *Pine v. Okoniewski*, 11 N.Y.S.2d 13, 14 (App. Div. 1939) ("[W]hen no time of payment is specified in a simple contract for the payment of money, it is payable immediately."). Third, the Note is payable to the order of GEM, the holder. The sole remaining issue, therefore, is whether the Note contains an unconditional promise to pay a sum certain in money.

Where the question is one of contract interpretation, a court must begin by examining the

12

language of the contract.  *See Maryland Cas. Co. v. W.R. Grace and Co.*, 23 F.3d 617, 624 (2d

Cir. 1993).  The language at issue here concerns the nature of SurgiLight's obligation to repay the

Note.  Under New York law, a promise to pay is unconditional even if it is "subject to implied or

constructive conditions" or if it "refers to or states that it arises out of a separate agreement or

refers to a separate agreement for rights as to prepayment or acceleration."  N.Y. U.C.C. §§ 3-

105(1)(a),(c); *see also A.I. Trade Fin., Inc.*, 41 F.3d at 836 (finding note negotiable where it

merely referred to underlying agreement but did not require reference to that agreement for

determination of a condition or term); *In re Apponline.com, Inc. v. Matrix Cap. Bank*, 321 B.R.

614, 622-23 (Bankr. E.D.N.Y. 2004) (finding notes negotiable where they referenced mortgages

whose sole purpose was to provide lenders with additional security).  However, a promise to pay

is not unconditional if the instrument "states that it is subject to or governed by any other

agreement."  N.Y. U.C.C. § 3-105(2)(a).  If one must refer to an extrinsic fact in order to define a

necessary term of repayment in a note, the note is not a negotiable instrument.  *See Enoch v.

Brandon*, 164 N.E. 45, 46-47 (N.Y. 1928) ("If in the bond or note anything appears requiring

reference to another document to determine whether in fact the unconditional promise to pay a

fixed sum at a future date is modified or subject to some contingency, then the promise is no

longer unconditional."); *D'Andrea v. Feinberg*, 256 N.Y.S.2d 504, 505-06 (App. Div. 1965)

(holding that language "as per contract" in note does not affect negotiability, whereas "subject to

or governed by" would).  Moreover, "no agreement may make negotiable an instrument which

the statute declares to be nonnegotiable."  *Enoch*, 164 N.E. at 46-47.

Defendants contend that the Note is not negotiable because it is governed by the April 11,

2003 Agreement.  Defendants argue that the Note makes specific reference to the April 11, 2003

Agreement, and under that Agreement, Plaintiff is only entitled to interest, not principal, in the case of default. Plaintiff argues that the Note is negotiable because all repayment terms are on the face of the Note. According to Plaintiff, Defendants' interpretation of the Note allows Defendants to default under the Note in order to avoid ever repaying the principal, which was not the intention of Parties.

In order to resolve this dispute, the Court must look to the language of the Note. *See In re Apponline.com, Inc.*, 321 B.R. at 622. Plaintiff chastises Defendants for leaving off the second half of the sentence which Defendants argue supports their position. Plaintiff then cites a portion of the second half of the sentence, contending that it supports Plaintiff's interpretation. Plaintiff could also be subject to chastisement because it leaves off the last five words of the now twice-misquoted sentence. (Notice of Mot. Ex. D) In full, the sentence reads:

> This Note is issued pursuant to the Agreement, dated April 11, 2003 by and between Maker and Holder ("the Agreement"), to which Agreement reference is hereby made for a statement of the rights of Holder and the duties and obligations of Maker in relation thereto; but neither this reference to the Agreement nor any provisions thereof shall affect or impair the absolute and unconditional obligation of Maker to pay the principal of this Note, *subject to applicable conversion events*.

(Grocock Decl. Ex. E 12) (emphasis added)

At oral argument, Plaintiff claimed that the italicized phrase is governed by New York's U.C.C. However, the "applicable conversion events" which trigger Defendant SurgiLight's obligation to pay are defined in paragraph one of the Note entitled "Conversion." (Grocock Decl. Ex. E 12 ¶ 1) In that paragraph, the Note states that "[t]he aggregate principal amount and interest due under this Note is convertible into shares of the Maker's common stock under the specific terms and conditions set forth in the Agreement." (Notice of Mot. ¶ 1) The

Agreement's conversion procedures provide that on April 11, 2003, GEM shall convert a certain amount of the Note into shares. (Notice of Mot. Ex. C ¶ 3(a)) The outstanding balance due under the Note shall be converted into shares immediately upon the effectiveness of a Certificate of Amendment to SurgiLight's Certificate of Incorporation, increasing the number of authorized shares sufficient to fulfill the entire balance of the Note. (Notice of Mot. Ex. C ¶ 3(b)) This Certificate of Amendment must be filed with the Florida Secretary of State by July 31, 2003, or SurgiLight will have defaulted on the Note. (Notice of Mot. Ex. C ¶ 3(b))

The Note also provides for the payment of interest by SurgiLight in the case of default. The provision states that "[u]pon the Maker's default as set forth in § 3(b) of the Agreement . . . this Note shall accrue and bear interest payable in cash and on demand at the rate of eight percent (8%) per annum." (Grocock Decl. Ex. E 12 ¶ 3) Again, in order to determine the trigger for the payment of default interest, one must reference the April 11, 2003 Agreement. The Agreement states that if the Certificate of Amendment is not filed by July 31, 2003, then SurgiLight is in default of the Note. (Notice of Mot. Ex. C ¶ 3(b))

Anyone reading the Note would see that "the absolute and unconditional obligation of [SurgiLight] to pay the principal of this Note" is "subject to applicable conversion events." (Grocock Decl. Ex. E 12) The reader then must inquire as to which "applicable conversion events" repayment of the Note is subject. In order to determine these events, the reader of the Note must refer to the April 11, 2003 Agreement, as directed in paragraph one of the Note. (Grocock Decl. Ex. E 12 ¶ 1) When fairly construed, the language of the Note requires reference to the April 11, 2003 Agreement in order to determine the terms of repayment. Therefore, payment of the Note is "subject to" the conversion terms of the April 11, 2003 Agreement, and

the Note is not a negotiable instrument. *See D'Andrea*, 256 N.Y.S.2d at 505-06; *Enoch*, 164 N.E. at 46-47.

When read together, the Note and the April 11, 2003 Agreement entitle GEM to be repaid in the form of common shares as soon as SurgiLight files a Certificate of Amendment increasing the number of authorized shares to a number that would permit it to honor the Note. In the event that SurgiLight did not file the Certificate of Amendment by July 31, 2003, GEM only would be entitled to significant annual interest payments in cash. Those payments would continue until the Certificate of Amendment is filed and the remaining shares are converted.

Plaintiff relies on *Kornfeld v. NRX Techs., Inc.*, 461 N.Y.S.2d 342 (App. Div. 1983) in support of its argument that the mere fact a note is convertible into stock does not make it a conditional promise. However, the facts of *Kornfeld* are distinguishable from the situation at hand. In *Kornfeld*, the principal amount of the notes was payable on a certain day, but the plaintiffs had the option of converting that principal into shares any time prior to the due date. 461 N.Y.S.2d at 343. Here, the due date *is* the date of the "conversion events" as defined in the April 11, 2003 Agreement. On April 11, 2003, a certain amount of the balance of the Note was to be converted into shares. On the date that the Certificate of Amendment was filed, the remaining balance was to be converted. Thus, unlike in *Kornfeld*, it is clear here that the Note was to be payable in shares. *Cf. Horne v. Law Research Serv., Inc.*, 316 N.Y.S.2d 367, 367 (App. Div. 1970) (holding that a passing reference to conversion, especially where the right of conversion has expired prior to a plaintiff's demand for payment, does not change the character of a note as one for the payment of money). This conclusion is highlighted by the language used in paragraph 3(b) of the April 11, 2003 Agreement in defining conversion and default. Paragraph

3(b) states:

> [T]he outstanding balance due under the Note . . . *shall automatically*
> *be converted into the remaining Total Conversion Shares* . . . immediately
> upon the effectiveness of an amendment to SurgiLight's Certificate of
> Incorporation . . . . Failure of the Certificate of Amendment to be effective
> by July 31, 2003 shall constitute a default under the Note, whereupon the
> Remaining Balance *shall bear interest payable in cash* and upon demand at
> the rate of eight percent (8%) per annum . . . .

(Notice of Mot. Ex. C ¶ 3(b)) (emphasis added)[2]  First, paragraph 3(b) provides that the Note

*shall* be converted into *shares*.  Second, paragraph 3(b) states that if Defendants default, the

remaining balance *shall* bear interest payable in *cash.*  The April 11, 2003 Agreement, to which

the Note refers for a definition of the terms upon which payment is conditioned, clearly

distinguishes between payment of the principal and payment of default interest – the former is to

be made in shares and the latter in cash.  The clear language of the April 11, 2003 Agreement

undermines any argument by Plaintiff that the principal of the Note was payable in cash.

Plaintiff once again cites *Kornfeld* in support of its argument that Defendants are required

to pay the entire principal balance because of their default.  Plaintiff quotes *Kornfeld* as saying

that "[t]he default in the payment of interest . . . accelerated the principal sums."  (Reply Mem. of

Law in Further Supp. of GEM Global Yield Fund Ltd.'s Mot. for Partial Summ. J. ("Pl.'s Summ.

J. Reply") 6)  However, in *Kornfeld*, the notes explicitly provided for acceleration of the payment

of principal upon default in the payment of interest.  *Kornfeld*, 461 N.Y.S.2d at 343.  No such

acceleration clause exists in the Note or the Agreement at issue here.  Therefore, Plaintiff is only

---

[2]Whether the fact that the principal of the Note was to be repaid in shares affects the
negotiability of the Note is a question the Court need not answer because it already determined
that repayment of the Note is subject to the terms of the April 11, 2003 Agreement, and therefore,
it is not a negotiable instrument.

entitled to interest payments while Defendants are in default.

However, the Note and the April 11, 2003 Agreement unambiguously require Defendants to pay Plaintiff interest in the amount of eight percent per annum in the event of default from the date of the default until the effective date of the Certificate of Amendment and full conversion of the Note. (Notice of Mot. Ex. C ¶ 3(b)) Defendants have been in default under the Note since July 31, 2003 because SurgiLight failed to file a Certificate of Amendment with the Florida Secretary of State. Defendants offer various excuses for their failure to file the Certificate of Amendment, all of which are irrelevant here. *See Chevron TCI, Inc. v. Talleyrand Assocs., LLC*, No. 03 Civ. 4043, 2003 WL 22977498, at *5 (S.D.N.Y. Dec. 19, 2003) ("Where the terms of an agreement are clear and unambiguous, the Court will not look beyond the 'four corners' of the agreement, and parol evidence of the parties' intentions is inadmissible."). The Defendants even concede that, upon default under the Note, they are required to pay default interest. (Defs. Opp. 23, 25) At oral argument, Defendants' counsel conceded that SurgiLight was in default, but argued that granting summary judgment on the default interest would lead to piecemeal litigation. (Tr. 11-12) At best, that argument may permit Defendants to hold off writing a check, but there is no need for trial on this point.

The Note is not a negotiable instrument and, therefore, Plaintiff's Motion for Partial Summary Judgment is denied in part. However, Plaintiff is entitled to summary judgment on the portion of the Note and the April 11, 2003 Agreement providing the payment of default interest.[3]

---

[3]Because the Note is not negotiable, the Court need not address Plaintiff's request for a preliminary injunction.

B.  Defendants' Motion to Amend to Assert Counterclaims

1.  Standard

Federal Rule of Civil Procedure 15(a) provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."). "In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant . . . , [or] futility of amendment, etc. - the leave sought should, as the rules require, be 'freely given.'"  *Foman*, 371 U.S. at 182.

2.  Unfair Prejudice, Undue Delay, and Bad Faith

"The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith."  *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).  "In determining what constitutes 'prejudice,' [the Court is to] consider whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."  *Id.*  A court may also consider whether "[t]he motion comes on the eve of trial after many months or years of pretrial activity," or "witnesses have become unavailable for examination and the memories of others may have dimmed."  *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Corp.*, 68 F.R.D. 383, 385-86 (N.D. Ill.1975).  "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a

district court to deny the right to amend." *Block*, 988 F.2d at 350 (quotation omitted).

Plaintiff argues that Defendants' counterclaims will cause it undue prejudice because Defendants oppose Plaintiff's Motion for Partial Summary Judgment on two grounds – one of which is that granting the Motion would necessitate additional litigation to resolve Defendants' counterclaims. As discussed above, Plaintiff's Motion for Summary Judgment is denied on other grounds. Therefore, the Court need not address this argument.

Plaintiff also suggests that Defendants' request to amend was made in bad faith because Defendants waited eleven months after the Complaint was filed to move to add their counterclaims, and four years after Defendants were aware of the alleged bases for the counterclaims. (*See* Letter from J. Bennet Grocock to Chris Brown, Aug. 2, 2001 (questioning GEM regarding alleged violations of the Debenture Agreement) attached as Ex. B to Grocock Decl.) Defendants respond that the delay in moving to add counterclaims was not the result of bad faith. Rather, Defendants argue that they were consumed with challenging Plaintiff's Order to Show Cause seeking a preliminary injunction which was not withdrawn until August 10, 2004. According to Defendants, the Parties then conferred about stipulating to permit amended pleadings. Before the stipulation was resolved, however, Plaintiff filed its Motion for Partial Summary Judgment on April 10, 2005. Thereafter, Defendants promptly requested permission to file their Motion to Amend on April 12, 2005. Given this time line of events, the Court finds that Defendants did not act in bad faith in waiting to move to amend their answer.

Plaintiff also argues that permitting Defendants to amend would cause undue delay. "Prejudice to the opposing party if the motion is granted has been described as the most important reason[] for denying a motion to amend." *Berman v. Parco*, 986 F. Supp. 195, 217

(S.D.N.Y. 1997) (citations and quotations omitted).  Permitting Defendants to amend, however, would not result in prejudicial delay to Plaintiff.  This is not a situation where a party filed its motion on the eve of trial.  *Cf. Pereira v. Cogan*, No. 00 Civ. 619, 2002 WL 31496224, at *4 (S.D.N.Y. Oct. 31, 2002) (denying motion to amend where defendant filed it one day before trial and where his attempt to amend as of right had been rejected two months earlier).  Moreover, because the Parties have not engaged in extensive discovery, permitting Defendants to amend their answer will not require further discovery.  *Cf. A. Cherney Disposal Co.*, 68 F.R.D. at 386 (denying motion to amend where case was five years old, parties had engaged in "voluminous" discovery, and amendment would require two more years of discovery).  Neither Party has argued that certain witnesses have become unavailable because of Defendants' delay, so there is no concern regarding lost evidence or testimony.  Finally, the case has not yet been scheduled for trial.  Therefore, permitting Defendants to amend will allow resolution of all disputes arising out of the Debenture and April 11, 2003 Agreements to be resolved in one litigation.  *See Hazeldine v. Beverage Media, Ltd.*, 6 AD Cases (BNA) 1821, 1824 (S.D.N.Y. Jan. 28, 1997) (finding no undue delay resulting from amendment where trial date had not yet been established).  Plaintiff has not made a showing of prejudice or bad faith on behalf of Defendants.

### 3.  Futility

Plaintiff also argues that Defendants' Motion to Amend should be denied because Defendants' proposed counterclaims are futile.  Defendants reply that there are legal grounds upon which the relief they seek can be granted, and therefore, they should be permitted to amend.

"Where the proposed amended [answer] would not withstand a motion to dismiss, the granting of leave to amend would be futile, and hence the motion should be denied."  *In re*

21

*Winstar Commc'ns v. Rouhana*, No. 01 Civ. 3014, 2006 WL 473885, at * 1 (S.D.N.Y. Feb. 27, 2006); *see also Nechis v. Oxford Health Plans, Inc*., 421 F.3d 96, 104 (2d Cir. 2005) (affirming district court's denial of motion to amend complaint where proposed amended claims failed on their merits); *McKenna ex rel. U.S. v. Senior Life Mgmt., Inc.*, 429 F. Supp. 2d 695, 696 (S.D.N.Y. 2006) (denying leave to amend the answer where it would be futile); *Blanck v. Consol. Edison Ret. Plan*, No. 02 Civ. 7718, 2006 WL 177003, at *2 (S.D.N.Y. Jan. 24, 2006) (denying defendant's request to amend answer where proposed state law claim would be preempted by ERISA). "In determining whether a pleading should be dismissed for failure to state a claim, the court must accept the allegations in the [pleading] as true and construe all allegations in favor of the pleader." *Barrett v. U.S. Banknote Corp*., No. 92 Civ. 7420, 1992 WL 232055, at *3 (S.D.N.Y. Sept. 2, 1992). "The court's function on a . . . motion [to dismiss] is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Dismissal is appropriate "only if there are no legal grounds upon which relief may be granted." *Virgilio v. City of New York*, 407 F.3d 105, 111 (2d Cir. 2005). "In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner Inc*., 937 F.2d 767, 773 (2d Cir. 1991).

<u>a.  Violation of Section 16(b) of the Securities and Exchange Act of 1934</u>

Defendants allege that Plaintiff violated both sections 16(a) and (b) by failing to file required statements and by engaging in buy-sell transactions of SurgiLight stock within a six

month period that resulted in short-swing profits.[4]  Section 16(a) of the Act, 15 U.S.C. § 78p(a),

provides that "the beneficial owner of more than 10 percent of any class of any equity

security . . . shall file the statements required by this subsection with the Commission."

15 U.S.C. § 78p(a)(1).  The statements must be filed "before the end of the second business day"

after there has been a change in ownership.  15 U.S.C. § 78p(a)(2)(C).[5]  Section 16(b) prohibits a

beneficial owner from realizing a profit from "any purchase and sale, or any sale and purchase, of

any equity security" of which it is a beneficial owner at the time of both the purchase and the sale

"within any period of less than six months."  15 U.S.C. § 78p(b).  Suits to disgorge profits

realized in violation of section 16(b) must be brought within two years after the date the profit

was realized.

        Plaintiff argues that the proposed amended counterclaim is futile because it is time

barred.  In Defendants' First Amended Answer and Counterclaim, Defendants failed to explicitly

allege that transactions in violation of section 16(b) occurred within the last two years.  However,

in their Second Amended Answer and Counterclaim, Defendants allege that Plaintiff "engag[ed]

in unlawful insider trading by purchasing and then selling, or by short selling and then

purchasing, SurgiLight stock within six months from February 14, 2000 up to and through at

----

[4]Defendants' First Amended Answer and Counterclaim stated a cause of action for Plaintiff's alleged violated section 16(a).  However, Defendants withdrew that claim upon recognition that there is no private right of action under section 16(a).  (Defs.' Reply Mem. of Law in Support of Defs.' Mot. to Am. to Assert Counterclaims ("Defs.' Reply") 2)

[5]The Parties do not contest that GEM is a beneficial owner under section 16.  Rule 16a-1(a)(1) defines a "beneficial owner" for the purposes of section 16 as "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act."  17 C.F.R. § 240.16a-1.  Section 13(d)(3) states that "two or more persons act[ing] as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer . . . shall be deemed a 'person.'"  15 U.S.C. § 78m(d)(3).

least February 11, 2005."[6]  (Second Am. Answer ¶ 139)  Indeed, Defendants compiled stock transactions for this period in a chart reflecting daily trading volume, dates on which escrowed shares were released to GEM, and the price at which those shares were released.  (Byler Reply Decl. Ex. A)  Plaintiff interprets this chart to support only the allegation that it realized short-swing profits when shares were released from escrow.  (Letter from Venturini to the Court 2-3, July 13, 2006)  According to Plaintiff, because shares were last released from escrow on December 19, 2001, Defendants' cause of action under section 16(b) expired on December 19, 2003.  (*Id.*)  Defendants' chart, however, demonstrates that SurgiLight shares were traded nearly every day up through February 11, 2005.  Defendants allege that GEM bought and sold SurgiLight shares, and consequently realized profits in violation of section 16(b), as late as February 2005.  (Second Am. Answer Ex. A)  Therefore, Defendants allege that they were injured by Plaintiff's alleged violation of section 16(b) within two years of their proposed Amended Answer.  Although Defendants may not be able to ultimately substantiate these allegations at trial, they are sufficient to withstand a motion to dismiss.[7]

> b.  Violation of Section 10(b) of the Securities and Exchange Act
> of 1934 and SEC Rule 10b-5

Defendants' second proposed counterclaim is that GEM violated section 10(b) of the Act

---

[6]In the "Allegations Common to All Counterclaims" section of the Second Amended Answer and Counterclaim, Defendants allege that Plaintiff engaged in transactions in violation of section 16(b) from February 14, 2000 to April 11, 2003.  (Second Am. Answer ¶ 127)  In light of the allegation in paragraph 139, the Court assumes that this was a misstatement.  Additionally, the chart Defendants refer to in support of this allegation includes transactions up through February 11, 2005.  (Second Am. Answer Ex. A)

[7]Because the Court finds that Defendants' section 16(b) cause of action is not time barred, it need not address whether the statute of limitations pertaining to section 16(b) was tolled.

by engaging in market manipulation. Section 10(b) prohibits market manipulation schemes "that deceive[] or defraud[] investors by controlling or artificially affecting the price of securities."[8] *In re Initial Public Offering Secs. Litig.*, 241 F. Supp. 2d 281, 297 (S.D.N.Y. 2003). To make out a market manipulation claim under section 10(b) and Rule 10b-5, Defendants must allege that "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 238 (S.D.N.Y. 2006) (quoting *In re Initial Public Offering Secs. Litig.,* 241 F. Supp. 2d at 385); *see also In re Global Crossing, Ltd. Secs. Litig.*, 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004).

"Courts have long held that complaints pleading securities fraud claims must comply with [Fed. R. Civ. P.] 9(b) by stating the circumstances constituting fraud with particularity." *In re Initial Public Offering Secs. Litig.,* 241 F. Supp. 2d at 329. However, at the pleading stage, "scienter - 'intent, knowledge, and other condition of mind' - 'may be averred generally.'" *Id.* (quoting Fed. R. Civ. P. 9(b)). Because "'market manipulation claims present circumstances in which the mechanism of the scheme is likely to be unknown to the plaintiffs . . . the Complaint sets forth a sufficient level of detail by alleging the nature, purpose, and effect of the fraudulent

---

[8]Rule 10b-5 makes it unlawful:
(a) To employ any device, scheme, or artifice to defraud, [or]
. . . .

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

conduct and the roles of the defendants.'" *Initial Public Offering Secs. Litig.*, 241 F. Supp. 2d at

385) (quoting *In re Bleck Sec. Litig.*, 961 F. Supp. 569, 582 (S.D.N.Y. 1997)). "At a minimum,

it is clear that a market manipulation claim must still specify what manipulative acts were

performed, which defendants performed them, when the manipulative acts were performed, and

what effect the scheme had on the market for the securities at issue." *Internet Law Library, Inc.*

*v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474, 486 (S.D.N.Y. 2002) (quotations

omitted).

Defendants allege that between February 11, 2000 to April 11, 2003 Plaintiff sold a large

quantity of SurgiLight shares so that the price of the shares would decrease (i.e., "short sell").

(Second Am. Answer ¶¶ 125, 127)  The average daily trading volume increased from 12,000

shares to 135,000 shares to one million shares on certain days.  (Second Am. Answer ¶ 125)

Plaintiff then allegedly acquired SurgiLight stock at an artificially low price under its convertible

debenture rights by requesting that shares be released from escrow.  (Second Am. Answer

¶¶ 125, 127)  Thereafter, Plaintiff discontinued short selling to permit the price to rise to a

normal value.  (Second Am. Answer ¶ 127)  Plaintiff allegedly engaged in these market activities

in order to manipulate the market to its benefit so that it could acquire more stock from

SurgiLight than it would have acquired in an unmanipulated market.  (Second Am. Answer ¶

145)

Plaintiff argues that Defendants' section 10(b) and Rule 10b-5 claims are time barred.

Claims pursuant to section 10(b) and Rule 10b-5 must be filed "'within one year after the

discovery of the facts constituting the violation and within three years after such violation.'"

*Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (citing 15 U.S.C. § 78i(e)

(2000)).  The Second Circuit has adopted a "reasonable investor" standard regarding discovery of facts triggering the running of the statute of limitations.  "A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. Cigna Sec., Inc*., 12 F.3d 346, 350 (2d Cir. 1993).  "'Discovery of facts for the purposes of this statute of limitations includes constructive or inquiry notice, as well as actual notice.'" *Newman*, 335 F.3d at 193 (quoting *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) (internal quotation marks omitted)).  Once an investor has constructive, inquiry, or actual notice of facts suggesting fraud, "a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Dodds*, 12 F.3d at 350.  "[A]n investor is not required to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds*, 12 F.3d at 351-52.

Defendants allege that they were injured because Plaintiff manipulated the market by short-selling SurgiLight's stock prior to conversion in order to convert shares from escrow at a depressed price.  As a result, SurgiLight issued more stock to Plaintiff than it otherwise would have, and Plaintiff allegedly knew that it was illicitly profiting from its market manipulation.  Although Plaintiff continued trading shares through April 11, 2003, the last time it converted shares from escrow – and therefore, the last time SurgiLight was injured by issuing shares at a depressed price – was December 19, 2001.  (Byler Reply Decl. Ex. A)  If a reasonable investor would have been on notice of probable fraud by that point, then Defendants' section 10(b) and Rule 10b-5 causes of action expired on December 19, 2002.

Defendants concede that as early as 2000, they were aware of Plaintiff's alleged short-selling of SurgiLight shares.  (Defs.' Opp. 2)  On August 2, 2001, SurgiLight's counsel sent a

letter to GEM alleging that it was exceeding daily trading volumes. (Defs.' Opp. 8) At the same time that GEM's trading volume was increasing, the price of SurgiLight's shares was dropping. (Byler Reply Decl. Ex. A) GEM converted SurgiLight shares on November 24, 2000 at a price of $5.17. (*Id.*) On June 26, 2001, the conversion price was $1.07. (*Id.*) On December 19, 2001 – the last conversion date – the conversion price was $0.29. (*Id.*) Not only would the correlation between increased trading volume and dropping conversion prices put a reasonable investor on notice of probable fraud, *see Newman*, 335 F.3d at 195 (acknowledging that decline in stock price is a factor supporting a finding of inquiry notice), it apparently put SurgiLight on actual notice. According to Defendants, in August 2001, "SurgiLight's concern was that GEM was engaging in a practice of actively trading the SurgiLight shares to manipulate the market for its own benefit." (Defs.' Opp. 8) It would be inconsistent for Defendants on the one hand to rely on the increased trading volume and dropping share price to support its claim of section 10(b) violation, while on the other hand, claiming that they did not have notice of probable fraud. *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 381 (S.D.N.Y. 2003), *aff'd*, *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005). The latest point at which Defendants could have asserted a section 10(b) or Rule 10b-5 claim was December 19, 2002. Defendants original Answer was filed on July 8, 2004. Therefore, Defendants' section 10(b) and Rule 10b-5 claims are time barred.

### c. Breach of Debenture Agreement

The third counterclaim alleges that Plaintiff breached the Debenture Agreement by exceeding its volume restrictions. The Debenture Agreement provides that, in any one day, neither Party shall sell a number of SurgiLight shares in excess of fifteen percent of the average

of the common stock's previous five trading days' daily trading volume. (Grocock Decl. Ex. A § 4.27) Defendants allege that Plaintiff consistently exceeded the trading volume restrictions contained in the Debenture Agreement from June 30, 2002 until April 11, 2003. (Second Am. Answer ¶¶ 121-27; Byler Reply Decl. Ex. A) Indeed, it was the breach of the trading volume restrictions, according to Defendants, which led in part to the April 11, 2003 Agreement. (Second Am. Answer ¶ 126; Grocock Decl. Ex. B, C)

Plaintiff argues that Defendants cannot allege a breach of the Debenture Agreement because it has been superseded by the April 11, 2003 Agreement. The April 11, 2003 Agreement provided that "simultaneously with the execution and delivery of this Agreement, SurgiLight shall execute and deliver to GEM the convertible promissory note." Furthermore, "the Note replaces and supercedes the Debenture and Debenture Purchase Agreement in all respects, and all obligations and rights of the parties under the Debenture and Debenture Purchase Agreement are hereby terminated and of no further force and effect." (Grocock Decl. Ex. E 1 ¶ 1) The April 11, 2003 Agreement also provides that New York law governs. (Grocock Decl. Ex. E 8 ¶ 16(j))

"In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Israel v. Surinder Chabra*, 418 F. Supp. 2d 509, 518 (S.D.N.Y. 2006) (finding no release where amended agreement only revised timing of payments). "It is well settled that 'where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement.'" *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 124 (App. Div. 1984) (quoting *Am. Broad.-Paramount*

29

*Theatres v. Am. Mfrs. Ins. Co.*, 265 N.Y.S.2d 76, 85 (App. Div. 1965)).  "[W]hether the

agreements rescinding the original [agreement] also effected a discharge depends on the intention

of the parties, deduced from the documents and the circumstances of their execution."  *Mallad*

*Const. Corp. v. County Fed. Sav. & Loan Ass'n*, 298 N.E.2d 96, 101 (N.Y. 1973).  Under New

York law, a novation is a new contract replacing and extinguishing a prior contract and requires

proof of four elements: "'(1) a previously valid obligation; (2) agreement of all parties to a new

contract; (3) extinguishment of the old contract; and (4) a valid new contract.'"  *Israel*, 418 F.

Supp. 2d at 523 (quoting *In re Balfour MacLaine Int'l, Ltd.*, 85 F.3d 68, 82-83 (2d Cir.1996)).

　　　The Parties do not dispute that elements one, two, and four of a novation are satisfied –

(1) the Debenture Agreement was a valid contract, (2) they both agreed to the April 11, 2003

Agreement, and (4) the April 11, 2003 Agreement is valid.  The dispute centers on the third

element – whether the Debenture Agreement was extinguished.  Defendants argue that it was not

because there is no clear language of release of claims arising out of the Debenture Agreement

prior to April 11, 2003.  Defendants' argument, however, is unconvincing.  The language of the

April 11, 2003 Agreement is unambiguous – the Note "replace[d] and supersede[d]" the

Debenture Agreement "in all respects" and "terminated" "all rights and obligations" under the

Debenture Agreement.  (Notice of Mot. Ex. E 1 ¶ 1)

　　　Defendants admit that they knew of the breach of the trading volume restrictions in the

Debenture Agreement as early as 2001.  Yet, if defendants "were truly aggrieved by the alleged

breach of the first contract, they gave up their rights by signing the [second] contract."  *Citigifts,*

*Inc. v. Pechnik*, 112 N.Y.S.2d 752, 753 (App. Div. 1985) (finding plaintiffs released from first

contract where second contract stated "[t]his agreement supersedes any concurrent or previously

signed documents"); *see also Blair & Co. v. Otto V.*, 171 N.Y.S.2d 203, 209 (App. Div. 1958) (finding release where second agreement stated that party was no longer interested in the first agreement and no longer had any liability thereunder). Therefore, paragraph one of the April 11, 2003 Agreement contained a release of any obligations or rights arising under the Debenture Agreement and Defendants' counterclaim for breach of the Debenture Agreement is futile.

### d. Breach of Fiduciary Duty by Edward Tobin

Finally, Defendants allege a claim for breach of fiduciary duty against Edward Tobin, a principal of GEM, who is also a member of SurgiLight's Board of Directors. Plaintiff argues that Defendants' proposed counterclaim against Tobin is instead a third-party claim because Tobin was not a party to the original action. According to Plaintiff, the Court lacks subject matter jurisdiction over the proposed claim and should not exercise supplemental jurisdiction.

Fed. R. Civ. P. 14 governs third-party practice and provides that a defendant may serve a complaint against a person not a party to the original action "who is or may be liable" to the defendant "for all or part of the plaintiff's claim" against the defendant. Fed. R. Civ. P. 14(a). "The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against him by the original plaintiff." *Siemens Westinghouse Power Corp. v. Dick Corp.*, 299 F. Supp. 2d 242, 248 (S.D.N.Y. 2004) (quoting 6 Charles Alan Wright, et al., *Federal Practice and Procedure* § 1446, at 377 (2d ed. 1990)). Defendants are not attempting to shift liability for Plaintiff's claims against them to Tobin by making a claim against him. Therefore, Defendants' claim against Tobin is not a third-party claim.

Instead, what Defendants propose is a counterclaim against a new party. Fed. R. Civ. P.

31

13(h) provides that "[p]ersons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20." Fed. R. Civ. P. 13(h). Rule 19 governing the joinder of necessary parties does not apply here because Defendants do not argue that Tobin is a necessary party, nor could they. Instead, Rule 20 applies.

"Under Rule 20(a), a party may be joined to an action if: (1) the right to relief of that party arises out of the same transaction, series of transactions, or occurrence; and (2) there are some common questions of law or fact presented." *Novak v. TRW, Inc.*, 822 F. Supp. 963, 973 (E.D.N.Y. 1993) (citing *Shaw v. Munford*, 526 F. Supp. 1209, 1213 (S.D.N.Y. 1981)). While courts have adopted a case-by-case approach in determining whether Rule 20(a)'s requirements are met, *see Viada v. Osaka Health Spa, Inc.*, 235 F.R.D. 55, 61 (S.D.N.Y. 2006), "the requirements of Rule 20(a) should be interpreted liberally in order 'to enable the court to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding.'" *Liegey v. Ellen Figg, Inc.*, No. 02 Civ. 1492, 2003 WL 21361724, at *1 (S.D.N.Y. June 11, 2003) (adding owner of the company as a party to plaintiff's workplace discrimination suit against company because owner potentially subject to personal liability for discrimination allegedly committed by company employees) (quoting *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 Civ. 4978, 1998 WL 159059, at *5 (S.D.N.Y. April 1, 1998)); *see also Kovian v. Fulton County Nat. Bank and Trust Co.*, No. 86 Civ. 154, 1990 WL 36809, at *9 (N.D.N.Y. March 28, 1990) (adding parties where pattern of racketeering constituted a series of transactions and RICO issue constituted a common issue of law). "In attempting to affix a definition to 'transaction or occurrence,' courts have found Fed. R. Civ. P.

13(a) to be particularly instructive, and have concluded with reference to that Rule that the phrase encompasses 'all logically related claims.'" *Viada*, 235 F.R.D. at 61 (*quoting Puricelli v. CNA Ins. Co.*, 185 F.R.D. 139, 142 (N.D.N.Y. 1999) (internal citation omitted)). "The requirement for commonality can be satisfied even if there is only one common question of either law or fact." *DirecTV, Inc. v. Lewis*, No. 03 Civ. 6241, 2004 WL 941805, at *6 (W.D.N.Y. Jan. 6, 2004).

Defendants argue that its claim against Tobin arises out of the same series of transactions or occurrences as Plaintiff's claims against them. There are three categories of transactions involved here – Defendants' alleged concealment of liens and "pump and dump" schemes leading up to the execution of the Debenture and April 11, 2003 Agreements, Defendants' alleged breach of its obligations under the April 11, 2003 Agreement, and Tobin's alleged post-April 11, 2003 breach of fiduciary duty owed to SurgiLight as a member of its Board. The Court must determine whether these transactions constitute a "series of transactions or occurrences" that satisfies Rule 20(a).

Even in light of these distinct categories of transactions, Defendants assert that Tobin's actions as a Board member are "part and parcel of GEM's conduct in relation to SurgiLight." (Defs.' Reply 26) Because Tobin became a member of the Board pursuant to the April 11, 2003 Agreement and Plaintiff is suing for alleged breaches of that Agreement, Defendants contend that the claims stem from the same series of transactions. That might be true if, for example, Plaintiff was suing Defendants for the Board's failure to take certain action which in fact Tobin vetoed or obstructed, prohibiting SurgiLight from meeting its obligations. However, that is not this case. Defendants do not claim that Tobin's actions on the Board prohibited them from meeting their obligations under the April 11, 2003 Agreement. Nor do Defendants allege that GEM acted in

conspiracy with Tobin to sabotage SurgiLight's performance under the April 11, 2003

Agreement.  Rather, Defendants contend that Tobin revealed confidential information to GEM

and to SurgiLight's competitors and litigation adversaries, made false accusations against Cozean

and the Board, and purported to act on behalf of SurgiLight without authority.  Even Defendants'

allegation that Tobin engaged in "obstructive behavior concerning resolutions proposed to the

SurgiLight Board that were required by law or that related to matters involving GEM" (Second

Am. Answer ¶ 133) does not contend that Tobin obstructed resolutions pertaining to the April 11,

2003 Agreement.  Instead, this allegation merely involves claims that he may have had a conflict

of interest because of his relationship with GEM.  This claim, however, is simply unrelated to the

other transactions at issue in this case.  *See Carabillo v. Ullico, Inc.*, 357 F. Supp. 2d 249, 255

(S.D.N.Y. 2004) (denying amendment of a party where defendant drew "no coherent connection"

between the issue in the complaint and the counterclaim); *Gen. Elec. Co. v. Compagnie Euralair,*

*S.A.*, 945 F. Supp. 527, 538 (S.D.N.Y. 1996) (denying amendment of a party where there was no

suggestion that new party's claim was connected in any way to the allegations in the original

complaint).

Furthermore, there is no common issue of law or fact between Plaintiff's claims against

Defendants and Defendants' claim against Tobin.  As to common issues of fact, although the

April 11, 2003 Agreement created Tobin's position on the Board and is the basis for Plaintiff's

claims, it is irrelevant to Defendants' claim against Tobin.  The facts relevant to Defendants'

claim are statements Tobin may have made to the SurgiLight Board, its competitors, and GEM,

as well as actions taken by Tobin at Board meetings.  None of those facts is related to Plaintiff's

claims of pre-April 11, 2003 securities violations or the alleged breach of the April 11, 2003

Agreement on the part of SurgiLight. As to common issues of law, Plaintiff asserts a breach of contract claim as well as common law and statutory fraud and securities fraud claims arising out of alleged representations and omissions made by Defendants. Defendants, on the other hand, assert a breach of fiduciary duty arising out of Tobin's alleged breach of confidentiality and conflict of interest. Thus, there are no common issues of law.

Therefore, because Defendants have not satisfied the requirements of Rule 20(a), joinder of Tobin as a party is improper and Defendants may not amend their answer to include a counterclaim against him.[9]

## IV. Conclusion

Accordingly, for the reasons stated above, Plaintiff's Motion for Partial Summary Judgment is DENIED. Defendants' Motion to Amend to Assert Counterclaims is GRANTED IN PART and DENIED in part. The Clerk of Court is directed to terminate the Motions (Doc. Nos. 30, 41).

SO ORDERED.

Dated:     August 17, 2006
           New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

_____

[9]Because Defendants' Motion is denied as to this counterclaim, the Court need not address Plaintiff's argument that the Court lacks subject matter jurisdiction over the claim.

35

Service List:

August Charles Venturini, Esq.
Venturini & Associates
New York, NY
*Counsel for Plaintiff*

Philip Arwood Byler, Esq.
Nesenoff & Miltenberg, LLP
New York, NY
*Counsel for Defendants*